[599 NYS2d 718]

JOSEPH E. McDERMOTT, Individually and as President of the Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO et al., Respondents, v EDWARD V. REGAN, as Comptroller of the State of New York, et al., Respondents, and STATE OF NEW YORK, Appellant. (And Two Other Related Actions.)

Third Department, July 1, 1993

APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General,* Albany *(Peter G. Crary* of counsel), for appellant.

*Nancy E. Hoffman,* Albany, for Joseph E. McDermott and others, respondents.

*Gail Hill Gordon,* Albany *(John F. Black* of counsel), for Edward V. Regan and others, respondents.

*Dreyer, Boyajian & Tuttle,* Albany *(James B. Tuttle* of counsel), for Edward W. Guzdek and others, respondents.

*Rowley, Forrest, O'Donnell & Hite,* Albany *(Richard R. Rowley* of counsel), for District Council 82, respondent.

*Richard E. Casagrande,* Albany *(Jeffrey G. Plant* of counsel), for Howard A. Shafer and others, respondents.

## OPINION OF THE COURT

YESAWICH JR., J. P.

The New York Constitution provides that public employees of New York and its subdivisions, and their designated beneficiaries, have a constitutionally established contract right to the benefits of membership in the public retirement system to which they belong, as those benefits existed at the time they

joined the system *(see,* NY Const, art V, § 7; *Civil Serv. Empls. Assn. v Regan,* 71 NY2d 653, 658; *Birnbaum v New York State Teachers Retirement Sys.,* 5 NY2d 1, 9). At issue in this case is whether the Legislature may force defendant Comptroller to use particular methods of valuing the funds from which those benefits are derived and of calculating employer contributions for a given year, or whether such a mandate constitutes an impermissible impairment of the contractual rights of the retirement systems' members.

In 1938, in response to a judicial determination that an employee's right to pension or retirement benefits could be withdrawn at any point prior to actual retirement, the New York Constitution was amended to provide that, from and after July 1, 1940, "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired" (NY Const, art V, § 7). Prior to that enactment, and at all times thereafter until 1990, the Comptroller, who is the administrative head of the New York State Employees' Retirement System and the New York State and Local Police and Fire Retirement System *(see,* Retirement and Social Security Law §§ 11, 311), and trustee of the fund in which the assets of those systems are held *(see,* Retirement and Social Security Law §§ 13, 313), has used a method known as the aggregate cost (hereinafter AC) method for calculating the necessary employer contributions to the fund each year. Under this method, the value of the fund's total assets and projected employee contributions are subtracted from the present value of projected benefits for all employees, and the remainder is allocated over the future working lifetime of active employees to produce an annual employer contribution figure. The AC method results in a contribution figure which, as a percentage of payroll, varies only moderately over time.

In 1990, however, legislation was passed which prescribes that a different method, the projected unit credit (hereinafter PUC) method, be used *(see,* L 1990, ch 210 [hereinafter chapter 210]) to calculate employer contributions. Under the PUC method, recognized actuarially as one of the least conservative funding techniques, unaccrued employee benefits are not treated as a present obligation and hence need not be considered when determining the employer's annual contribution figure. Because the AC method results in the funding of some benefits before they are accrued, one consequence of the change to the PUC method is the manifestation, on the

systems' books, of an actuarial surplus of approximately $9 billion. Chapter 210 also provides for the rapid amortization of that surplus, by allowing contributing employers to offset a portion of the amount currently due to be paid into the system against a share of this surplus, termed a "valuation credit". The end result of these changes is a drastic reduction in employer contributions to the fund in the short term and depletion of the surplus; when the surplus is exhausted, employers' contributions must then be made at levels higher than would be necessary had the AC method been utilized. The PUC method also results in necessary contributions becoming more volatile, that is, more likely to fluctuate widely from what has been predicted. This change in funding methods, which essentially shifts the burden of funding the retirement systems from the present to the future, was admittedly imposed upon the Comptroller in an attempt to ease the State's budgetary problems.

Plaintiffs collectively commenced these three actions seeking a declaration that chapter 210 is unconstitutional. The Comptroller and the State, which intervened in those actions in which it was not a named defendant, answered. All the parties requested summary judgment and Supreme Court obliged to the extent of deciding that only the Comptroller may, in his or her discretion, change the retirement systems' funding method, and by entering a judgment declaring sections 1 through 7 of chapter 210 to be unconstitutional. The State alone appeals; the Comptroller has filed a brief expressing agreement with Supreme Court's ruling.

■ We affirm. The State's principal contention is that because the statutes which were in existence when the constitutional amendment was enacted established guidelines for setting the rate of employer contributions, they effectively reserved to the Legislature the authority to dictate how such contributions are calculated. Assuming, for the purpose of argument, that the Legislature may indeed place some constraints on the Comptroller's discretion to set contribution levels (see, Retirement and Social Security Law § 11 [c] [2]), as it may with regard to permissible investments, that flexibility is not unlimited. "Close examination is * * * required of any radical change in means chosen to maintain the integrity and security of the *sources* from which the concededly protected benefits are to be paid" (*Sgaglione v Levitt,* 37 NY2d 507, 512 [emphasis supplied]). The method of fixing the rate of contributions is undoubtedly such a means (*supra,* at 511-512), and

chapter 210 clearly represents a radical change—one which, on close examination, we find effects an unconstitutional impairment of the rights of the retirement systems' members. The imposition of a particular funding method, as opposed to the mere setting of guidelines for selection of a method, vitiates the members' right to have the benefit of the Comptroller's discretion in fixing the amount of contributions needed for the continued stability and security of the systems *(see also, Patterson v Carey,* 41 NY2d 714, 723-724). Surely, if as *Sgaglione v Levitt (supra)* teaches, the Legislature cannot require the Comptroller—who has a fiduciary duty to act as an independent trustee of retirement systems' funds—to invest in legislatively selected bonds, it cannot compel the Comptroller to carry out the dramatic funding changes which chapter 210 works. Moreover, chapter 210 does not simply impose a funding method on the Comptroller; it also dictates the rapid depletion of the surplus funds that currently exist, a further usurpation of the Comptroller's authority to manage the accounts of the fund.

The State's argument that the PUC method is "actuarially sound" ignores the fact that the retirement systems' members are entitled to more than simply a guarantee of benefits; they are entitled to some degree of "protection of the sources of funds" from which those benefits will ultimately be drawn *(Sgaglione v Levitt, supra,* at 511), and a shift from a very safe method of maintaining those funds to another which is less safe, but nonetheless "actuarially sound", may work an impairment of that right.

■ In addition to the imposition of the PUC method of calculating contributions, and the swift absorption of surplus funds occasioned thereby, chapter 210 also required that the Comptroller revalue the assets of the fund for fiscal years 1988 and 1989 using a different "smoothing method"* than that chosen for those years upon the advice of his selected actuary, and that he provide the Director of the Division of the Budget with advance notice of any changes made to the method of actuarial valuation. These requirements also strip the systems' members of their right to the Comptroller's

---

* According to the Director of the Division of the Budget, "smoothing [is a] technique * * * used to limit the fluctuations inherent in stock market investing by averaging several years of stock market results when determining employer contributions".

independent judgment, and therefore they too are also uncon-stitutional *(see, supra,* at 512).

LEVINE, MERCURE, MAHONEY and HARVEY, JJ., concur.

Ordered that the judgment is affirmed, with one bill of costs to plaintiffs.